# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

JOSEPH REIVER,                                    )
                                                  )
    Plaintiff,                            )
                                                  )
    v.                                    )  **CIVIL ACTION NO.  1:25-cv-01376-MKV**
                                                  )
THE CITY OF NEW YORK,                             )
                                                  )
    Defendant.                            )


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF JOSEPH REIVER'S MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Steven J. Hyman (2097)
Oliver R. Chernin (4516)
McLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
Phone (212) 448-1100
shyman@mclaughlinstern.com
*Attorneys for Plaintiff*

Norman Siegel (6850)
SIEGEL TEITELBAUM
& EVANS, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
Phone: (212) 455-0300
nsiegel@rstellp.com
*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................................... i

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     STATEMENT OF FACTS ......................................................................................... 2

   A.   THE CREATION AND NATURE OF THE GARDEN ......................................... 2

   B.   DEFENDANT'S STATED INTENTION TO PROCEED WITH THE
        PROJECT IRREVOCABLY DESTROYING THE GARDEN ............................... 6

   C.   ALL ATTEMPTS TO STAY DEFENDANT'S COMMENCEMENT OF
        THE PROJECT HAVE BEEN EXHAUSTED ....................................................... 7

III.    ARGUMENT ............................................................................................................. 8

   A.   PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF
        AND A TEMPORARY RESTRAINING ORDER .................................................. 8

   B.   VARA CONTROLS THE DISPUTE .................................................................... 10

        1.   Introduction ................................................................................................ 10

        2.   As Co-Author of the Garden, Plaintiff Has the Rights Conferred
             by VARA ..................................................................................................... 11

        3.   The Garden is a Work of Visual Art Entitled to VARA Protection ......... 11

        4.   The Garden is a Work of Recognized Stature ........................................... 17

        5.   Defendant's Stated Plan to Raze the Garden Will be Prejudicial to
             Plaintiff's Honor or Reputation ................................................................. 18

   C.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE GARDEN
        IS RAZED ............................................................................................................. 20

   D.   THE BALANCE OF EQUITIES TIPS IN FAVOR OF MAINTAINING
        THE GARDEN IN ITS PRESENT CONDITION ................................................ 21

   E.   THE PUBLIC INTEREST IS BENEFITTED IN MAINTAINING THE
        GARDEN ............................................................................................................... 21

IV.     CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*3M Co. v. Performance Supply, LLC*,
    458 F.Supp. 3d 181(S.D.N.Y. 2020) ................................................................ 8

*Abdul Wali v. Coughlin*,
    754 F.2d 1015 (2d Cir. 1985) ........................................................................... 9

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) ......................................................................... 8, 9

*BigStar Entm't, Inc. v. Next Big Star, Inc.*,
    105 F. Supp. 2d 185 (S.D.N.Y. 2000) ............................................................. 9

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) ...................................................................................... 18

*Bourne Co v. Tower Records, Inc.*,
    976 F.2d 99 (2d Cir. 1992) ............................................................................ 20

*Carter v. Helmsley Spear, Inc.*,
    852 F. Supp. 228 (S.D.N.Y. 1994) ............................................................... 20

*Carter v. Helmsley-Spear, Inc.*,
    71 F.3d 77 (2d Cir. 1995),
    *cert. denied*, 517 U.S. 1208 (1996) ............................................ 12, 13, 17, 19

*Carter v. Helmsley-Spear, Inc.*,
    861 F. Supp. 303 (S.D.N.Y. 1994)
    (*rev'd on other grounds*, 71 F.3d 77 (2d Cir. 1995) ................................ 13, 19

*Castillo v. G&M Realty*,
    950 F.3d 155 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 363 (2020) ...... 17, 18, 19

*English v. BFC E. 11th St. LLC*,
    1997 U.S. Dist. LEXIS 19137 (S.D.N.Y. 1997);
    *aff'd*, 1999 U.S. App. LEXIS 23697 (2nd Cir. 1999) ....................................... 13

*Kelley v. Chicago Park District*,
    2008 U.S. Dist. LEXIS 75791 (N.D. Ill. (2008) ............................................ 15

*Kelley v. Chicago Park District*,
    635 F.3d 290 (7th Cir. 2009) .................................................................. 15, 16

*Martin v. City of Indianapolis*,
    192 F.3d 608 (7th Cir. 1999) ...................................................................... 17

*Oneida Nation of New York v. Cuomo*,
    645 F.3d 154 (2d Cir. 2011)........................................................................ 8

*Phillips v. Pembroke Real Estate*, *Inc.,*
    288 F. Supp. 2d 89 (D.Mass. 2003) ...................................................... 14, 15

*Phillips v. Pembroke Real Estate*, *Inc.,*
    459 F.3d 128 (1st Cir. 2006) ................................................................. 14, 15

*Pollara v. Seymour,*
    344 F.3d 265 (2d Cir. 2003)...................................................................... 18

*Video Trip Corp. v. Lighting Video, Inc.*
    866 F.2d 50 (2d Cir. 1989)........................................................................ 20

## **Statutes**

17 U.S.C. §101 ............................................................................................ 11

17 U.S.C. §106A ................................................................................... passim

17 U.S.C. §106A(a) ..................................................................................... 11

17 U.S.C. §106A(a)(3) ................................................................................. 11

17 U.S.C. §106A(a)(3)(A) ...................................................................... 10, 18

17 U.S.C. §106A(a)(3)(B) ................................................................. 10, 17, 18

17 U.S.C. §106A(b) ..................................................................................... 11

17 U.S.C. §106A(e)(2) ................................................................................. 11

17 U.S.C. §113(d) ........................................................................................ 20

28 U.S.C. §2201 ................................................................................................................ 1

28 U.S.C. §2202 ................................................................................................................ 1

New York State Environmental Quality Review Act ...................................................... 7

**Other Authorities**

H.R.Rep. No. 514, 101st Cong., 2d Sess. at 11 (1990),
    *reprinted* in 1990 U.S.C.C.A.N. 6915, 6921) ................................................... 12

**Rules**

Fed. R. Civ. P. 65 ............................................................................................................. 1

## I.        <u>PRELIMINARY STATEMENT</u>

Plaintiff Joseph Reiver ("Plaintiff") moves for a temporary restraining order ("TRO") and preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to maintain the *status quo* of Elizabeth Street Garden (the "Garden") until a resolution of this action, enjoining Defendant The City of New York ("Defendant"), its agents, attorneys, and employees, and all those acting in concert with them, from taking any action that will destroy, distort, mutilate or otherwise modify the Garden, in violation of 17 U.S.C. §106A (the "Visual Artist Rights Act" or "VARA"), or deny Plaintiff and the public access to the Garden.

Plaintiff filed this action on February 18, 2025, asserting his rights under the Visual Artist Rights Act (VARA), 17 U.S.C. §106A*, et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, seeking, *inter alia*, an injunction preventing any intentional or negligent destruction, distortion, mutilation, or other modification of the Garden during his lifetime. Defendant was served on February 20, 2025. An Answer is due March 13, 2025.

Defendant intends to raze the Garden, a work of recognized visual art protected by VARA, and construct on the lot a 7-story, mixed-use building containing approximately 123 units of housing, ground floor retail, and office space for a developer (the "Project"). The Garden's destruction, distortion, mutilation, and/or modification will be irreversible and will be prejudicial to the honor and reputation of Plaintiff, the Garden's co-author.

To proceed with the Project, Defendant terminated the lease of Elizabeth Street, Inc., the lessee to the lot, effective October 31, 2021. By decision, verdict and order, dated May 8, 2024, the Civil Court of the City of New York awarded the City of New York a final judgment of possession and a money judgment against the lessee. The lessee appealed the May 8, 2024 to the New York State First Judicial Department Appellate Term, Supreme Court, and was granted a

temporary stay of eviction, but on February 26, 2025, the Appellate Term affirmed the May 8, 2024. Defendant has issued a Warrant of Eviction (*see*, attached Exhibit "A") dated March 7, 2025 and eviction can proceed as early as March 24, 2025.

Injunctive relief now is necessary because Plaintiff faces the very real risk that Defendant will proceed with its stated plans to destroy the Garden. If permitted to proceed with its plans, the *res* that forms the basis for this action will be irrevocably lost. To protect himself and the Garden from Defendant's plans, Plaintiff seeks limited and temporary injunctive relief to preserve the *status quo* pending a disposition of this action on the merits.

## II.    STATEMENT OF FACTS

The facts relevant to this Motion are summarized below and fully set forth in the Declarations of Joseph Reiver ("Reiver Decl."), Mara Miller ("Miller Decl."), Klaus Biesenbach ("Biesenbach Decl."), JR ("JR Decl."), Jeffrey L. Brodie, Ph.D. ("Brodie Decl."), Noah Chasin ("Chasin Decl."), and Patti Smith, ("Smith Decl."), accompanying the Order to Show Cause.

### A.    THE CREATION AND NATURE OF THE GARDEN

The Garden now is a beautifully landscaped, publicly accessible open green space comprising 20,110 square feet, located at 207 Elizabeth Street, New York, NY 10012, in Manhattan's Little Italy neighborhood. However, back in February of 1991, when Allan Reiver ("Allan"), Plaintiff's deceased father, through his wholly owned company Elizabeth Street, Inc., first leased the lot from Defendant, it was no more than a dismal junk yard. Notwithstanding the lot's condition, Allan saw an opportunity to create an oasis of tranquility in the midst of a dense urban environment.

While Allan had no formal artistic training, in the 1970's he had restored several derelict properties in Denver, Colorado, by incorporating therein culturally and historically important architectural artifacts and sculptures. He developed these artistic skills further in the late 1980's to design and create a garden on a Metropolitan Transit Authority lot on the upper east side. By virtue of this experience, Allan had become a representative of the Outsider Art School, a legitimate school of art distinguished predominantly by work created by self-taught artists like Allan. After Plaintiff joined Allan in the design of the Garden, culminating in its present integrated whole, Allan passed on to his son his acquired experience in repurposing and placing reclaimed antique sculptures and garden design. This training, coupled with Plaintiff's experience in implementing the Reivers' joint vision for the Garden, resulted in Plaintiff becoming recognized, in his own right, as a representative of the Outsider Art School. The jointly authored Garden became the Reivers' signature artistic creation.

To turn the dismal lot into the work of visual art that it is today, initially Allan and subsequently together with his son Joseph Reiver, the Plaintiff here, jointly created an integrated whole sculptural work of visual art, comprised of foundational elements and repurposed and reclaimed antique sculptures, carefully selected to emphasize the work's neo-classical theme. The fixed inorganic elements of the work are enhanced by plantings, specially curated to accentuate the reclaimed sculptures. The physical components of the Garden are complemented by the collective and participatory process through which the public interacts with the Garden, qualifying the work as an exemplary social sculpture.

The Reivers followed a detailed step-by-step approach to create the work of visual art. Initially, the lot was cleared, creating a blank canvas. Thereafter, the foundational structure of the Garden was designed and installed. It is comprised of a front lawn, two pear trees, and a broad

gravel walkway that runs from the entrance of the Garden, through the east-west axis of the lot, terminating at a barn-like lean-to in the back. To develop a neo-classical theme, prominent stone and granite balustrades were strategically placed to border the walkway, extending for most of its length on each side. There is a consistent line of the work that runs through the Garden bordering main walkways and intentionally creating small pocket areas to "find" or sit in.  The main portion of the balustrade tees off to create two sections where people can walk through gardening beds. The foundational elements give way to these pocket areas with the intention of inviting visitors to interact with the work, sit amidst it, and move through it.

After completion of the foundation, sculptural elements were placed throughout the Garden, comprising of figure sculptures, primarily of iconic animals or mythical creatures, an iron gazebo, designed by the Olmsted Brothers for Burrwood, the former home of Walter Jennings, one of the original directors of the Standard Oil Company, Greek style columns, and the iconic iron gates at the entrance of the Garden.

Each sculptural element selected for the Garden enhances the neo-classical theme. Thus, Roman style sphinxes are combined with the first balustrade section to act as guardians of the entrance and exit. The standing lions placed on either side of the main walkway are there as guardians to the entrance with more aggressive features showing their teeth.  Further behind at the center of the garden there are the two resting lions considered by many to be the most iconic element of the Garden.

The fixed inorganic elements of the Garden are complemented by plantings that have specifically been curated to accentuate the sculptural elements. For example, creeping ivy has been specifically planted to grow along the base of both the resting lions so that when the ivy grows out it is trained to grow along the lions mane and create a living Ivy mane for the summer

4

season. The selection of plantings takes into consideration seasonal changes incorporating that

into the work of art. Examples include a specific ivy planted along the balustrade balcony for the

summer along with a creeping clematis vine that flowers white in the fall and grows along a cast

iron piece that has been attached to the balcony, and creeping hydrangea vines plated to grow up

and over the stone colonnade located next to the gazebo on the front lawn.

The integration of the sculptural elements, all featuring a neo-classical theme, with the

Garden's foundational elements, characterized by the principal east-west principal path and the

prominent balustrades, supplemented by the plantings, create a single unified and thematically

integrated sculpture.

The physical components of the Garden are enhanced and complemented by the

collective and participatory process through which the public interacts with the Garden. In or

about 2005, after the foundational structure of the Garden was substantially completed, the

public was invited to visit the Garden through Allan's gallery, located next door to the Garden.

Since in or about 2013, once Allan and Plaintiff, with the assistance of volunteers, ensured safety

to the public and security for the Garden, the social aspect of the Garden was significantly

expanded, engaging the community as active participants in its evolving artistic narrative.

Examples of such engagement, initiated and organized by Plaintiff, include without

limitation, open calls to artists, which showcase artwork inspired by the Garden, musical

performances, poetry readings, movie screenings, wellness classes like tai chi and yoga, tea

ceremonies, educational workshops teaching sustainable stewardship and planting in the Garden

to local public-school students, (K-5th grade), and equinox and solstice celebrations. These

programs, hosted in the Garden, reflect the principles of social sculpture, transforming the

physical space into a hub of artistic and communal activity, making the Garden an exemplary

social sculpture, deeply tied to public interaction, communal stewardship, and the physical environment. Continued access to the Garden by Plaintiff and the public is required to maintain the social sculpture of the Garden.

    **B.**    **DEFENDANT'S STATED INTENTION TO PROCEED WITH THE PROJECT IRREVOCABLY DESTROYING THE GARDEN**

Defendant has sought to construct a mixed-use affordable housing development for seniors at the site of the Garden since as early as 2016. The proposed Project is a 7-story, mixed-use building containing approximately 123 units of housing, ground floor retail, and office space for a developer. The construction of the Project, and related clearing of the lot, will destroy the Garden.

The choice between the preservation of the Garden, both as a unique work of visual art and significant community amenity, or housing is a false dichotomy. Plaintiff does not dispute that there is a critical need for affordable housing in New York City, including the Little Italy neighborhood. Throughout Defendant's efforts to destroy the Garden, Plaintiff diligently worked with the local Community Board, nonprofit organizations, as well as with elected officials, and private building managers and owners, to identify alternative sites in the district to construct housing, However, Defendant declined to adopt such alternate sites. Moreover, Plaintiff further presented a proposal to Mayor Adams and the NYC Housing Preservation Department for an alternate resolution that would avoid the destruction of the Garden. A copy of the proposal is attached as Exhibits 17a-17b to the Complaint herein. Mayor Adams and the NYC Housing Preservation Department and Defendant have not acted on this proposal.

Despite a public outcry by the affected community, including 130 local seniors, over 300 local businesses and organizations, local PS 130 students, joined by celebrity artists such as

Martin Scorsese, Robert De Niro, & Patti Smith, urging Mayor Adams to save the Garden, the Mayor and Defendant have reiterated that they will move forward with the Project.

### C.    ALL ATTEMPTS TO STAY DEFENDANT'S COMMENCEMENT OF THE PROJECT HAVE BEEN EXHAUSTED

Allan, Renee Green, a local resident and the chair of the Board of Directors of Elizabeth Street Garden, Inc., and related parties (as well as Friends of Elizabeth Street Garden, in a separate action) challenged the implementation of the Project in the New York Supreme Court on the ground, *inter alia*, that it failed to comply with the New York State Environmental Quality Review Act (SEQRA). While initially successful, at the Supreme Court level, in obtaining an order requiring Defendant to conduct a full Environmental Impact Statement before proceeding with the Project, this order was reversed by the New York State Appellate Division, First Department, on June 27, 2023. The New York Court of Appeals, on June 18, 2024, affirmed the order of the New York State Appellate Division, First Department. There is no further legal recourse available to the proponents for the Garden under SEQRA to stay the development of the Project.

In other legal proceedings, Defendant has terminated the lease of Elizabeth Street, Inc. to the lot, effective October 31, 2021. By decision, verdict and order, dated May 8, 2024, the Civil Court of the City of New York awarded the City of New York a final judgment of possession and a money judgment as against Elizabeth Street, Inc. The court stayed the execution of the warrant of eviction for four months and ordered an earliest execution date of the warrant of September 11, 2024. The Warrant of Eviction was served on October 2, 2024.

Elizabeth Street Inc., on May 13, 2024, filed a Notice of Appeal of the May 8, 2024 decision, verdict and order with the New York State First Judicial Department Appellate Term,

Supreme Court and also sought a stay of the eviction pending the final disposition. Although that motion was granted on October 31, 2024, was only a temporary reprieve. On February 26, 2025, the New York State First Judicial Department Appellate Term, Supreme Court affirmed the May 8, 2024 final judgment of possession.

Now that Defendant has prevailed on the appeal, Defendant has obtained a Warrant of Eviction (see, Exhibit "A") and can proceed with the eviction as early as March 24, 2025. Once eviction proceeds, Plaintiff and the community/public will have no further access to the Garden. This lack of access will make it impossible for Plaintiff to maintain the Garden. If the Project proceeds the Garden will be destroyed.

## III.    ARGUMENT

### A.    PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF AND A TEMPORARY RESTRAINING ORDER

To obtain a temporary restraining order or a preliminary injunction,[1] a moving party must show: (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest would not be disserved.  *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015) (internal citations omitted), *Oneida Nation of New York v. Cuomo,* 645 F.3d 154, 164 (2d Cir. 2011).

Plaintiff satisfies the requirements for injunctive relief.

---

1 The standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are the same. *3M Co. v. Performance Supply, LLC*, 458 F.Supp. 3d 181, 191 (S.D.N.Y. 2020)

First, Plaintiff is likely to succeed on the merits or, at a minimum, can show serious questions going to the merits: that Defendant's stated plans to destroy the Garden violate his rights under VARA.  Specifically, Plaintiff is likely to succeed in showing either that (a) Defendant's stated plans are prejudicial to his honor or reputation, or (b) that Defendant's stated plans to destroy the Garden violate Plaintiff's rights as the Garden is a work of a recognized stature, or (c) both (a) and (b).

To establish a likelihood of success on the merits, a plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent'". *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (*quoting Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). While Plaintiff surpasses this standard, he can certainly satisfy the alternative test of "sufficiently serious questions going to the merits to make them a fair ground for litigation" given that the balance of hardships stemming from any limited and temporary relief tips decidedly in his favor. *Benihana,* 784 F. 3d at 894-95.

Second, without injunctive relief, Plaintiff will suffer irreparable harm. If Defendant is permitted to proceed with its stated plans, the Garden will be irrevocably destroyed. Additionally, the destruction of Plaintiff's iconic work will permanently and prejudicially damage his honor and reputation.

Third, the balance of hardships tilts decisively in Plaintiff's favor.  If Defendant proceeds as intended, the Garden will be irreparably destroyed, to Plaintiff's permanent detriment. In contrast, a limited and temporary injunction – pending only the quick resolution of the merits of this action – will affect no unfair hardship on Defendant. It will at most delay the Project for a relatively short time period.

Fourth, the narrow injunction sought by Plaintiff will serve the public interest by (a) the preservation of an artwork of recognized stature; (b) the protection of the honor or reputation of artists; (c) the continued public accessibility to a significant community resource; and (d) the preservation of sorely needed green open space in a dense urban environment.

## B.    VARA CONTROLS THE DISPUTE

### 1.    Introduction

This action arises under the Visual Artist Rights Act (VARA), 17 U.S.C. §106A, *et seq.* Congress passed VARA in 1990 as an amendment to the Copyright Act. With the passage of VARA, authors of a work of visual art have the rights of attribution, *e.g.* to claim authorship of a work, and integrity, and the artist's right to prevent any intentional distortion, mutilation, or other modification of a work which would be prejudicial to his or her honor or reputation. 17 U.S.C. §106A(a)(3)(A); the statute also gives the artist the right to prevent the destruction of a work of recognized stature. 17 U.S.C. §106A(a)(3)(B). The present action involves both the right of integrity and the right to prevent the destruction of the Garden whose stature is widely recognized.

Since the passage of VARA, artists, for the duration of their life, have had the right to:

(A)    prevent any intentional distortion, mutilation, or other modification of a work of art which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right.
17 U.S.C. §106A(a)(3)(A), and

(B)    prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is also a violation of that right.
17 U.S.C. §106A(a)(3)(B).

10

The artist's rights conferred by VARA are distinct from any ownership of any copy of the work or of a copyright or any exclusive right under a copyright in that work. 17 U.S.C. §106A(e)(2). The fact that the Garden is located on a leased property and that Defendant now has been given the green light to evict the lessee is a non-issue as an author's assertion of rights under VARA do not require ownership or registration of the work.

Plaintiff is likely to prevail under either (or both) prongs or, at minimum, raise sufficiently serious questions going to the merits to make them a fair ground for litigation given that the balance of hardships stemming from any limited and temporary relief tips decidedly in his favor.

## 2.    As Co-Author of the Garden, Plaintiff Has the Rights Conferred by VARA

Only the author of a work of visual art has the rights conferred by 17 U.S.C. §106A(a) in that work, whether or not the author is the copyright owner. The authors of a joint work of visual art are co-owners of the rights conferred by subsection (a) in that work. 17 U.S.C. §106A(b) While Allan, Plaintiff's deceased father, was the original author of the Garden, Plaintiff, since as early as 2009, joined Allan in the design of the Garden culminating in its present integrated whole. Plaintiff is the co-author of the Garden and, accordingly, has standing to assert his VARA rights pursuant to both prongs of 17 U.S.C. §106A(a)(3).

## 3.    The Garden is a Work of Visual Art Entitled to VARA Protection

The Copyright Act defines a work of visual art as "a painting, drawing, print, or sculpture, existing in a single copy," or "in a limited edition of 200 copies or fewer." 17 U.S.C. §101. Excluded from the definition of visual art is "any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture, or other audio-visual work." *Id.* As explicitly recognized by the Second Circuit, while Congress meant to distinguish works of visual

art from other media, such as audio-visual works and motion pictures, relying on the Congressional record, the Court explained that to determine whether a work falls with the scope of the definition, "the courts should use common sense and generally accepted standards of the artistic community". *Carter v. Helmsley-Spear*, *Inc.,* 71 F.3d 77, 84 (2d Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996) (citing to H.R.Rep. No. 514, 101st Cong., 2d Sess. at 11 (1990), *reprinted* in 1990 U.S.C.C.A.N. 6915, 6921) ("Artists may work in a variety of media, and use any number of materials in creating their works. Therefore, whether a particular work falls within the definition should not depend on the medium or materials used.")

The concept of a garden as a work of art has been recognized throughout history. (*Miller Decl.*, p. 3).  Many precedents for gardens as fully conceived artworks unto themselves exist, from Sri Lanka's Sigiriya of the 5thc. BCE, to the 11th-century sites at Suzhou and Westminster Abbey, to the mid-15th-century gardens at Ryōan-ji, and—perhaps the best-known example— the 17th century Gardens at Versailles. (*Chasin Decl.*, p. 2). A current example of a Suzhou style garden is the Astor Court Garden exhibited at the Metropolitan Museum of Art. (*Miller Decl*., p. 8).

While gardens, including the forgoing examples, include natural elements, they also are designed and created by humans and, therefore, they owe their existence to human vision and creativity (*Miller Decl*. p. 3), *e.g.*, authorship in the copyright context.

Where gardens incorporate other arts, such as sculpture and architecture, music, dance, theatre, tea ceremony, and/or poetry readings, such compilations are quintessential *Gesamtkunstwerke* (total works of art), the totality constitutes a separate distinct work of art. (*Miller Decl*. p. 11). Where humans interact with the physical characteristics of the garden, the artwork constitutes a Social Sculpture. (*Miller Decl*. p. 12, *Biesenbach Decl*., p. 2).

12

The Garden at issue meets the criteria of a work of visual art. It is composed of many elements including stone urns, statues, columns, and other neoclassical architectural features, all of which have been strategically placed to create a harmonious environment. These elements work together as an indivisible whole, forming a physical sculptural installation that draws upon classical traditions while merging with its surrounding natural environment. (*Biesenbach Decl*., p. 2). When creating the Garden and, in particular, incorporating the sculptural elements into it, just as the artists in *Carter*, the Reivers selected each additional element based on the elements preceding it so that they would mesh together into an integrated whole. *Carter*, at 84. Thus, the balustrades were complemented by the placement of mythical animals and the inorganic elements were accentuated by specially curated organic plantings. Maintaining the neo-classical theme throughout, the Reivers created a single unified and thematically integrated sculpture.

Whether gardens are works of visual art entitled to VARA protection is yet to be determined in the Second Circuit. Although the issue as to whether a garden as a whole is an "environmental sculpture" is entitled to protection under VARA was raised in *English v. BFC E. 11th St. LLC*, 1997 U.S. Dist. LEXIS 19137 (S.D.N.Y. 1997); *aff'd*, 1999 U.S. App. LEXIS 23697 (2nd Cir. 1999), the court dismissed the action on other grounds (the work was placed on the property illegally). However, notwithstanding the dismissal, the court opined that Judge Edelstein's reasoning in the District Court decision in *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 314-315 (S.D.N.Y. 1994) (*rev'd on other grounds*, 71 F.3d 77 (2d Cir. 1995), finding that a work of art in a building lobby, consisting of various components affixed to the ceiling and walls and a mosaic on the floor and walls, constituted a "single work", provided support for plaintiff's argument that the protection of VARA is applicable to a garden. *English*, at *10. The *English* court concluded "[w]hether the Garden constitutes "a single piece of art, to be analyzed

13

under VARA as a whole, rather than separate works to be considered individually," is a question of fact." *Citing*, *Carter*, 71 F.3d at 83–84 (affirming district court's finding of singleness). Plaintiff submits that here Judge Edelstein's reasoning should control confirming that a garden, such as the one that is the subject of this action is entitled to VARA protection as a single integrated work of visual art.

The First and Seventh Circuit have had occasion to weigh in on whether gardens are entitled to VARA protection. While ultimately declining to extend such protection to a garden, these cases are clearly distinguishable from the present one. Therefore, these decisions, while relevant to some extent, do not control the present action.

*Phillips v. Pembroke Real Estate*, *Inc.,* 459 F.3d 128 (1st Cir. 2006), was an action by a sculptor under VARA and the Massachusetts Art Preservation Act (MAPA) seeking a preliminary injunction to prevent the manager of a public sculpture park from modifying the park and altering the sculptures that the plaintiff had created specifically for the park. At the District Court level, *Phillips v. Pembroke Real Estate*, *Inc.,* 288 F. Supp. 2d 89 (D.Mass. 2003) the court suggested that "[c]onceivably, a sculptor could design a sculpture garden that includes multiple inter-related sculptural elements that form an integrated work of visual art … substantial areas of the Park are unrelated to Phillips' sculpture and not integrated with it … While Phillips certainly assisted in designing the stone elements in the paths and wall and in placing his own sculptures, the Park as a whole is not an integrated work of art." *Id*. at 98-99. While leaving open the question whether a park (or garden) could be recognized as a work of visual art recognized by VARA, the District Court concluded that the park was not such a work.

The higher court did not rule on this critical issue, focusing instead on plaintiff's assertion that his sculptures were site-specific art and any movement of the sculptures to another

location would alter them physically. The First Circuit rejected plaintiff's claim, concluding that VARA does not protect site-specific art at all. 459 F.3d, at 143.

In contrast to the *Phillips* fact pattern, here the Reivers created the Garden from a bare, derelict, vacant lot. They did not simply create sculptures for existing space. Rather, they designed the Garden layout, carefully curated the sculptural elements to be installed and accentuated the inorganic elements with organic plantings. The entirety of the Garden was created by the Reivers, consistently following a unifying neo-classical theme. Under the teachings of the *Phillips* District Court opinion, the Garden clearly qualifies as a work of visual art entitled to VARA protection.

In the Seventh Circuit, the plaintiff had been commissioned by the City of Chicago to create a wildflower garden. When the city subsequently sought to reduce the size of the garden, plaintiff brought an action, alleging that the modifications and reduction in size of the original garden violated his rights under VARA. The District Court dismissed the artist's claim finding first, that although Wildflower Works could be classified as both a painting and a sculpture and therefore a work of visual art under VARA, it lacked sufficient originality to be eligible for copyright and second, following the *Phillips* decision, opined that site-specific art like Wildflower Works is excluded from protection under VARA. *Kelley v. Chicago Park District*, 2008 U.S. Dist. LEXIS 75791 (N.D. Ill. (2008).

The Seventh Circuit affirmed in part and reversed in part. *Kelley v. Chicago Park District*, 635 F.3d 290 (7th Cir. 2009). It questioned the District Court's conclusion that Wildflower Works is a painting or sculpture, further questioned the lower court's conclusion (as well as the *Phillips* holding) that all site-specific art is excluded from VARA, but affirmed the dismissal of the claim on the ground that the work did not qualify for copyright protection as the

artist did not author the work, nature did, and that the work did not meet the copyright requirement of fixation.

Because the defendant did not challenge the District Court's ruling that Wildflower Works is a painting or sculpture, the Seventh Circuit's rejection of this conclusion is entirely *dicta*. Instead, the Court rendered its adverse decision on the grounds that the Wildflower Works was insufficiently "authored" and lacked "fixation" and therefore not eligible for VARA protection. The basis for the Court's finding is that to be copyrightable the author must be human. For Wildflower Works, the Court concluded, the author was "the force of nature". *Id*. at 304. As for the fixation requirement, the Court concluded that a garden cannot be a "fixed copy of the gardener's intellectual property" …. "because seeds and plants are naturally in a state of perpetual change; they germinate, grow, bloom, become dormant, and eventually die." *Id*. at 305.

However, *Kelley* though skeptical, acknowledged that work need not be "static or fully permanent, or that artists who incorporate natural or living elements in their work can never claim copyright". *Id*. The District Court had held that VARA protection for Wildflower Works was applicable, analogizing the work to Jeff Koons' "Puppy", a large metal frame in the shape of a puppy covered with thousands of blooming flowers, and to Calder mobiles which moved in response to air currents. The Seventh Circuit found these analogies inapt. *Id*. at 305-306.

However, under the facts of the present action, even accepting the Seventh Circuit's analysis, the Garden is copyrightable. Here, the forces of nature play a secondary role, at best, (The Reivers only supplemented organic matter to inorganic elements to accentuate them) and the foundation of the Garden with the sculptural elements clearly satisfy the fixation requirement. Thus, the Garden, much more like the Koons Puppy or Calder mobiles, has a fixed stable design and consists of permanent inorganic structures that define it, supplemented by slow

16

growing organic components. The organic components do not alter the fixed attributes of the Garden any more than the Puppy's flowers or the air currents alter the Koons and Calder works.

### 4.    The Garden is a Work of Recognized Stature

To prevent the destruction of a work pursuant to 17 U.S.C. §106A(a)(3)(B), a plaintiff only needs to show that the work is of a recognized stature.  The Garden at issue in this action qualifies. The leading case in this circuit addressing VARA in general and, specifically, the "recognized stature" issue is *Castillo v. G&M Realty,* 950 F.3d 155 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 363 (2020). In *Castillo*, the Court had to determine whether aerosol art painted on the walls of warehouse buildings met this standard. Despite the fact that these works, at least in part, were temporary, the Court concluded that they did. *Id.* at 166.

The *Castillo* Court further found that a work is of recognized stature when its high quality, status, or caliber has been acknowledged by the relevant community, typically comprising of art historians, art critics, museum curators, gallerists, prominent artists, and other experts.  *Id.* at 166. A work's high quality, status, or caliber is its stature, and the acknowledgement of that stature speaks to the work's recognition. *Id.* at 166*, citing Carter*, 71 F.3d at 81; *Martin v. City of Indianapolis*, 192 F.3d 608, 612 (7th Cir. 1999).

*Castillo* further found that "recognized stature" is necessarily a fluid. concept. Thus, for example, a "poor" work by a highly regarded artist – e.g., anything by Monet – nonetheless merits protection from destruction under VARA. This approach helps to ensure that VARA protects "the public interest in preserving [the] nation's culture," *Id.* at 166.

*Castillo* cautioned that the personal judgment of the court is not the determinative factor in the court's analysis, being mindful of Justice Holmes's cautionary observation that "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final

judges of the worth of [visual art]," *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251 (1903); *accord Pollara v. Seymour,* 344 F.3d 265, 271 (2d Cir. 2003) ("We steer clear of an interpretation of VARA that would require courts to assess the worth of a purported work of visual art."). For that reason, aside from the rare case where an artist or work is of such prominence that the issue of recognized stature need not be tried, expert testimony or substantial evidence of non-expert recognition will be required to establish recognized stature. Here, there is such evidence. *See*, the attached Declarations in support.

If anything, this is an easier case than *Castillo*, which involved works that, in part, were temporary. Instead, this action involves a work that has been located on the lot since over 20 years. It has achieved local and nationwide recognition since its completion by experts and non-experts alike and has been the subject of numerous articles in the press and in on-line publications. (*See*, Declarations annexed hereto and Exhibits 4-16, attached to the Complaint and referenced in ¶¶ 61-65 of the Complaint.) The Garden clearly meets the standard and Plaintiff has the right, under 17 U.S.C. §106A(a)(3)(B), to prevent Defendant's stated plan to destroy the Garden.

## 5.    Defendant's Stated Plan to Raze the Garden Will be Prejudicial to Plaintiff's Honor or Reputation

17 U.S.C. §106A(a)(3)(A) grants the artist the right to prevent any intentional distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation. Such is the case here. Defendant's stated intention to raze the Garden and move forward with construction of the Project clearly will destroy, distort, mutilate, and/or otherwise will modify the Garden.

VARA recognizes that, unlike novelists or composers, for example, visual artists depend on the integrity of the physical manifestations of their works. Artists' moral rights "spring from a

belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." *Carter*, 71 F.3d at 81, *cited with approval* in *Castillo at* fn. 1.

In determining what would be 'prejudicial to the artist's honor and reputation," courts will consider whether such alteration would cause injury or damage to the artist's good name, public esteem, or reputation in the artistic community. *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994), (*rev'd on other grounds*, 71 F.3d 77 (2d Cir. 1995).

Plaintiff, and his co-author Allan have attained a reputation of an "outsider artist."[2] The Reivers expressed their artistic vision by not only creating a work of visual work of art to be contemplated but to also create a work of social sculpture, *e.g.*, transforming physical space into a hub of artistic and communal activity, deeply tied to public interaction, communal stewardship, and the physical environment. The Garden is a prime example of Plaintiff's artistic mission. *See*, *Miller Decl*. p. 12, *Biesenbach Decl*. p. 2-3. Defendant's plan to permanently raze the Garden, if permitted to proceed, will send the clear message to the art world and general public that social participation in art is without value and unworthy to be preserved. Not only will this denigrate the value of the work itself, it also will undoubtably tarnish Plaintiff's reputation as an artist committed to social participation in art. As a result, Defendant's stated plans, if permitted to proceed, would be extremely prejudicial to Plaintiff's reputation and honor.

---

2 Plaintiff's artistic qualifications and specific contributions to the Garden are set forth at in ¶¶ 50-57 of the Complaint.

### C.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE GARDEN IS RAZED

In order to be entitled to preliminary injunctive relief, a plaintiff must show that he will suffer irreparable harm if a preliminary injunction is not granted. Irreparable harm generally is presumed in the copyright context when the movant establishes a *prima facie* case of copyright infringement. *See, e.g., Bourne Co v. Tower Records, Inc*., 976 F.2d 99, 101 (2d Cir. 1992) *Video Trip Corp. v. Lighting Video, Inc.* 866 F.2d 50, 51–52 (2d Cir. 1989).  This standard is applicable to this action as VARA is an amendment to the United States Copyright Act.

Defendant has sought the eviction of the lessee of the lot on which the Garden is located and now, that it has obtained a final judgment of possession, Defendant has obtained a Warrant of Eviction (eviction can proceed as early as March 24, 2025) and will move forward with its plans to raze the Garden and proceed with the construction of the Project, unless constrained by this Court. If Defendant proceeds with this action, as planned, it will irrevocably damage the Garden.

Plaintiff has established, at minimum, a *prima facie* case that he is entitled to claim the rights set forth in 17 U.S.C. §§ 106A and 113(d), to wit, he is a recognized artist, the Garden is a work of recognized stature, and the Garden will be irrevocably damaged. As such, Plaintiff is entitled to the presumption of irreparable harm generally available in cases of copyright infringement. *See, Carter v. Helmsley Spear, Inc.,* 852 F. Supp. 228 (S.D.N.Y. 1994)

Moreover, the rights granted to artists by VARA go beyond economic rights to include the rights which protect the artist's personal association with his or her work. Plaintiff's honor and reputation could not be made whole by an award of mere money damages.  Absent injunctive relief; once the Garden is destroyed, this action cannot be effectively reversed.  If the Garden is altered or destroyed during the pendency of this action, Plaintiff will be left without a

satisfactory remedy if he should ultimately prevail on the merits. Thus, Plaintiff will be irreparably harmed absent preservation of the *status quo*.

### D.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF MAINTAINING THE GARDEN IN ITS PRESENT CONDITION

The balance of hardships in this case clearly favors keeping the Garden in its present condition. Defendant's plan to raze the Garden and construct the Project is irreversible and will cause permanent damage. On the other hand, the only "damages" Defendant will suffer, is a brief delay in implementing its Project plans.

In the unlikely event that Defendant should ultimately prevail, it will still be able to proceed with its stated plans. Defendant will, therefore, suffer no harm as a result of maintaining the Garden in its current state.

### E.    THE PUBLIC INTEREST IS BENEFITTED IN MAINTAINING THE GARDEN

If the Garden is razed, the community will be deprived not only of an artistic treasure but also of the only significant green open space sanctuary in an urban setting. Moreover, the Garden provides the public with multiple free activities, including musical performances, poetry readings, movies screenings, wellness classes, tea ceremonies. The Garden also serve as the basis for an educational experience, teaching sustainable stewardship and planting in the Garden to public-school students.

### IV.    <u>CONCLUSION</u>

The foregoing clearly demonstrates that in this action (1) Plaintiff has a likelihood of success on the merits or, at minimum, has raised sufficiently serious questions going to the merits to make

21

them a fair ground for litigation; (2) Plaintiff will suffer a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in Plaintiff's favor; and (4) that the public interest would not be disserved by the relief sought. Accordingly, Plaintiff respectfully requests that this Court grant a temporary restraining order or a preliminary injunction, preserving the *status quo* of the *res* in this action, pending a final decision on the merits.

Respectfully submitted,

THE PLAINTIFF

JOSEPH REIVER

By: _____

Steven J. Hyman (2097)
Oliver R. Chernin (4516)
McLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
Phone (212) 448-1100
shyman@mclaughlinstern.com
*Attorneys for Plaintiff*

New York, New York
Date:   March 7, 2025

By: _____

Norman Siegel (6850)
SIEGEL TEITELBAUM
& EVANS, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
Phone: (212) 455-0300
nsiegel@rstellp.com
*Attorneys for Plaintiff*