UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH REIVER,

        Plaintiff,

   v.

THE CITY OF NEW YORK,

      Defendant.

25-cv-01376 (MKV)(GS)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MURIEL GOODE-TRUFANT
Corporation Counsel of the
City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
Tel: (212) 356-2212

MICHELLE GOLDBERG-CAHN
MARK MUSCHENHEIM
GENAN F. ZILKHA
GREGORY B. O'BRIEN
NATHAN TAYLOR
      Of Counsel,

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF RELEVANT FACTS ........................................................................... 4

ARGUMENT ...................................................................................................................... 5

    A.    Standard of Review ...................................................................................... 5

    B.    Plaintiff has not Demonstrated an Irreparable Injury ................................. 6

    C.    Plaintiff Does not have a Likelihood of Success on the
          Merits of his VARA Claim .......................................................................... 6

          1.    VARA ............................................................................................. 6

          2.    The Garden was Constructed in Violation of the
                Lease and is not Therefore Entitled to the
                Protections of VARA ..................................................................... 7

          3.    Plaintiff is not the Artist under VARA and therefore
                does not have Standing to Seek Declaratory Relief ....................... 8

          4.    The Garden is Not a Work of Visual Art ....................................... 9

          5.    Assuming, Arguendo, the Garden is a Work of
                Visual Art, VARA does not Protect Site Specific
                Artwork from Relocation ............................................................. 15

          6.    The Garden is not a Work of Recognized Stature ....................... 18

          7.    Building Affordable Housing on the Site will not be
                Prejudicial to Plaintiff's Honor or Reputation ............................ 20

    D.    The Balance of the Equities Favors Denying the TRO and
           PI and the Public Interest Would not be Served by Granting
           the TRO or Permanent Injunction ............................................................. 21

CONCLUSION ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                    <u>Pages</u>

*AIM Intl. Trading, LLC v. Valcucine SpA*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002)..........................................................................5

*Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*,
    2003 U.S. Dist. LEXIS 10221 (S.D.N.Y. 2003 June 17, 2003) ...............................15

*Broker Genius, Inc. v. Volpone*,
    313 F. Supp. 3d 484 (S.D.N.Y. 2018)..........................................................................5

*Bryan v. Koch*
    492 F. Supp. 212 (S.D.N.Y. 1980) .............................................................................25

*Carter v. Helmsley-Spear, Inc.*,
    71 F.3d 77 (2d Cir. 1995)................................................................................7, 10, 11

*Carter v. Helmsley-Spear, Inc.*,
    861 F. Supp. 303 (S.D.N.Y. 1994) ................................................................18, 20, 21

*Castillo v. G&M Realty L.P.*,
    950 F.3d 155 (2d Cir. 2020)..........................................................................................7

*Cheffins v. Stewart*,
    825 F.3d 588 (9th Cir. 2016) ......................................................................................14

*Cohen v. G&M Realty L.P.*,
    988 F. Supp. 2d 212 (E.D.N.Y. 2013) .......................................................................18

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
    96 F.4th 351 (2d Cir 2024) ...........................................................................................5

*English v. BFC&R E. 11th St. LLC*,
    97 Civ. 7446 (HB), 1997 U.S. Dist. LEXIS 19137 (S.D.N.Y. Dec. 2, 1997) ..............8, 10, 11

*Hercules Pharms., Inc. v. Cherne*,
    No. 24 Civ. 5659 (JS), 2024 US Dist LEXIS 183232
    (E.D.N.Y. Sep. 18, 2024)............................................................................................22

*Hunter v. Cortland Hous. Auth.*,
    714 F. Supp. 3d 46 (N.D.N.Y. 2024)............................................................................6

*JTH Tax, LLC v. Agnant*,
    62 F.4th 658 (2d Cir 2023) ...........................................................................................5

**Cases**                                                    **Pages**

*Kelley v. Chicago Park Dist.*,
    635 F.3d 290 (7th Cir 2011) .......................................................................10, 12, 13, 14, 15

*Kerson v. Vermont Law Sch., Inc.*,
    79 F.4th 257 (2d Cir 2023) ...............................................................................................6

*Lexington Ave. Hotel, L.P. v. City of N.Y.*,
    23 Civ. 10190(GHW), 2023 U.S. Dist. LEXIS 215600
    (S.D.N.Y. Dec. 4, 2023)......................................................................................................5

*M.V. Music v. V.P. Records Retail Outlet, Inc.*,
    653 F. Supp. 3d 31 (E.D.N.Y. 2023) ...............................................................................5

*Marlinspike Hall LLC v. Bar Lab Concepts LLC*,
    No. 23 Civ. 2997 (JPO), 2023 US Dist LEXIS 185774 (SDNY Oct. 17, 2023) ....................21

*Martin v. City of Indianapolis*,
    982 F. Supp. 625 (S.D. Ind. 1997).................................................................................18

*Massachusetts Museum of Contemporary Art Found., Inc. v. Buchel*,
    593 F.3d 38 (1st Cir. 2010).............................................................................................21

*McGregor v. Suffolk County*,
    690 F. Supp. 3d 147 (E.D.N.Y. 2023) .............................................................................5

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)..............................................................................................22

*Pavia v. 1120 Ave. of the Ams. Assoc.*,
    901 F. Supp. 620 (S.D.N.Y. 1995) .................................................................................21

*Phillips v. Pembroke Real Estate, Inc.*,
    288 F. Supp. 2d 89 (D. Mass. 2003) .............................................................................11

*Phillips v. Pembroke Real Estate, Inc.*,
    459 F.3d 128 (1st Cir 2006)..........................................................................11, 12, 15, 16, 17

*Pollara v. Seymour*,
    344 F.3d 265 (2d Cir 2003)...................................................................................8, 14, 20

*Reuters, Ltd. v. United Press Intl., Inc.*,
    903 F.2d 904 (2d Cir 1990)..............................................................................................5

**Cases**                                                                                           **Pages**

*Tobin v. Rector*,
   17 Civ. 2622 (LGS), 2017 WL 5466705 (S.D.N.Y. 2017 November 14, 2017)
   *aff'd on other grounds, Tobin v. Rector, Church-Wardens,*
   *& Vestrymen of Trinity Church,*
   735 Fed. Appx. 32 (2d Cir. 2018) ...................................................................................16, 17

*U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*,
   673 F.3d 158 (2d Cir. 2012) .......................................................................................22

*We the Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) .......................................................................................5

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ....................................................................................................5, 6

**Statutes**

17 USC § 101 ..............................................................................................................7, 19

17 USC § 102(a) ..............................................................................................................13

17 USC § 106A ..............................................................................................................1

17 USC § 106A(a)(3) ......................................................................................................6

17 USC § 106A(b) ..........................................................................................................8

17 USC § 106A(c)(1) ......................................................................................................18

17 USC § 106A(c)(2) ................................................................................................16, 17

17 USC § 113(d)(1) ........................................................................................................18

17 USC § 116A(c)(2) ......................................................................................................15

Federal Rules of Procedure Rule 65 ...............................................................................5

**Other Authorities**

https://www.zumper.com/rent-research/new-york-ny/nolita
   (last visited March 12, 2025) .......................................................................................23

**PRELIMINARY STATEMENT**

At issue here is Plaintiff's latest attempt to further delay a court-ordered eviction from a property located at 207 Elizabeth Street in the NoLIta neighborhood of New York ("Premises"). In 1991, Plaintiff's father, Allan Reiver, through his Elizabeth Street, Inc. ("ESI") corporation, entered into a commercial a month, month-to-month lease ("Lease")[1] with the City for the Premises at a monthly rent of $4,000 – an amount that has not changed over three decades. Upon learning that the City would be terminating the Lease to build affordable housing for seniors, in 2013 Allan Reiver and Plaintiff opened the Premises to the public as the Elizabeth Street Garden ("Garden").

In 2019, the New York City Council voted to transform the Premises into permanently affordable and supportive housing for low income seniors earning no more than 60% of the area median income – some of the most vulnerable New Yorkers. As part of this project (titled "Haven Green") the City is also creating dedicated open space, which will be open to the public from dawn to dusk every day. This space will be required to be consistently open. Since Haven Green was first announced, the City also entered into a lease with a neighboring property doubling the open space guaranteed for 60 years.

The Premises has been the subject of ongoing litigation, in multiple *fora*, for over six years. Courts have repeatedly ruled in favor of the City and against ESI. Throughout these multiple lawsuits, ESI has not, until now, claimed that the Garden is a work of visual art, and has never invoked the Visual Artists Rights Act of 1990, 17 USC § 106A ("VARA"), which protects a work of visual art of recognized stature from intentional destruction. Now that the City has obtained a judgment awarding possession of the Premises to the City (after ESI received multiple

---

[1] A copy of the Lease is annexed to the Declaration of Genan F. Zilkha ("Zilkha Dec.") as Exhibit "A."

stays), Plaintiff claims that the Garden is a work of visual art of "recognized stature," that, as a result, the City is effectively prohibited from ever removing ESI from the premises, and that Plaintiff has the moral right to remain on the Premises maintaining the Garden until his death, regardless of ownership of the premises or the fact a court has ruled ESI may be evicted. In Plaintiff's conception, his "moral rights" to maintain the Garden as he pleases override all other laws or rights of the owner - the City. *See* Plaintiff's Memorandum of Law in Support of Order to Show Cause ("Pls. Mem.") at 11 ("The fact that the Garden is located on a leased property and that Defendant now has been given the green light to evict the lessee is a non-issue..."). Plaintiff's claims are without merit and Plaintiff is entitled to neither a temporary restraining order ("TRO") nor preliminary injunction ("PI").

First, Plaintiff cannot demonstrate an irreparable injury that is imminent, as required for a TRO or PI. ESI's eviction from the Premises will be occurring no earlier than March 24, 2025. On or about that date, the City will take possession of the Premises. Yet, no dismantling of the Garden will occur for at least 30 days. During that time, Plaintiff will be allowed supervised access to the Garden to arrange for, *inter alia*, the removal and potential relocation of the various statues. Only after this thirty-day period has expired will the City begin to take any initial steps to clear the site.

Second, Plaintiff does not have a likelihood of success on the merits of the VARA claim. As an initial matter, even if the Court concludes that the Garden is a "work of visual art," which it is not, Plaintiff does not have standing to bring claims under VARA as he is not the "author." Although he claims to be the "co-author" here – for the purposes of this lawsuit – in prior proceedings and hearings under oath he has explicitly described his late father as the person who created the Garden and himself as a mere caretaker. Caretakers do not have standing to bring

claims under VARA. Plaintiff cannot now claim to be the artist, contradicting all of his prior statements. Further, the Garden is not protected by VARA as it was constructed in violation of the Lease and there is no VARA protection for illegally constructed work.

More importantly, the Garden is not entitled to the protections of VARA because the Garden is not a work of visual art—defined in VARA as a "painting, drawing, print, or sculpture." Though Plaintiff seeks to shoehorn the Garden into this definition by defining the entire space as a single "sculpture," this effort strays far afield from the limits Congress placed on VARA protection. While the Garden certainly *contains* sculptures, none of these were created by Plaintiff or even his father. Instead, the Garden consists of Allan Reiver's curation of others' works. Defining this act of curation as "sculpting," as Plaintiff seeks to do, would expand VARA far beyond its text. The Garden is also not covered by VARA because a garden is not "fixed" so that it may be covered by copyright protection – a prerequisite for coverage under VARA. Plaintiff may not seek protection under VARA for the placement of, *inter alia*, the statues on the Garden because courts in this District have held that VARA does not cover the placement or presentation of artwork. Yet another reason the Garden does not constitute a work of visual art is, as a garden, it is at most applied art and applied art is not considered a work of visual art.

And even if the Garden were to be considered a work of visual art, VARA allows for the modification of a work of art by moving or altering its placement. To the extent Plaintiff claims moving the Garden would destroy it, this claim is not cognizable under VARA,

Plaintiff's VARA claim also fail because the Garden is not artwork of "recognized stature." Although Plaintiff has clearly demonstrated that the Garden is beloved as an open space with community programming – Plaintiff has failed to show that the Garden as a *work of art* has "stature." Plaintiff does not show that the Garden is recognized as an example of outsider art, or

that it has any artistic merit that goes beyond being appreciated by the community for its social setting and events.

Plaintiff's requests for a TRO and PI also fail because the balance of the equities favors denying the TRO and PI and the public interest will not be served by the TRO and PI . The City is in an affordable housing crisis that particularly impacts low-income seniors – the very individuals who will be served by Haven Green. The City has contracted with community groups who will provide much needed supportive services to these senior residents as well as to other members of the community. New affordable senior housing on the site will clearly serve the public interest. The harm of further delays to elderly New Yorkers on the brink of homelessness awaiting affordable housing outweighs any harm to Plaintiff if his request for a TRO or PI is denied . Litigation has already delayed Haven Green for six years – any further delay would cause additional harm.

Finally, although Plaintiff has maintained the Garden as a public space for more than a decade, prior to that, the Premises were closed to the public. Nothing – other than good will – requires that Plaintiff maintain the Garden as a public space. In fact, nothing prevents Plaintiff from locking the gates should he prevail in this action. To the contrary, should Plaintiff's request for a TRO or PI be denied, the City will have the opportunity to finally fulfill its plan to create permanent and reliable open space for the public. Thus, Plaintiff's request for a TRO and a PI should be denied.

## <u>STATEMENT OF RELEVANT FACTS</u>

Defendant respectfully refers the Court to the Zilkha Dec. and the Declaration of Michael Sandler ("Sand. Dec.") for a statement of relevant facts and exhibits annexed thereto.

## ARGUMENT

### A.    Standard of Review

"The standard for granting a [TRO and a PI] pursuant to Rule 65 of the Federal Rules of Procedure are identical." *AIM Intl. Trading, LLC v. Valcucine SpA*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002). "A plaintiff seeking a [PI] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir 2023) (*quoting Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "These requirements are demanding, for '[a] [PI] is an extraordinary remedy never awarded as of right.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir 2024) (*quoting JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666 (2d Cir 2023)).

Irreparable injury "must be shown by the moving party to be imminent, not remote or speculative." *Reuters, Ltd. v. United Press Intl., Inc.*, 903 F.2d 904, 907 (2d Cir 1990); *see also Lexington Ave. Hotel, L.P. v. City of N.Y.*, 23 Civ. 10190(GHW), 2023 U.S. Dist. LEXIS 215600, at *3 (S.D.N.Y. Dec. 4, 2023) (Denying a request for a TRO where the "harm is not imminent. It will come, if at all, when a ruling is made against Plaintiff in that proceeding."). "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent.'" *M.V. Music v. V.P. Records Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 41 (E.D.N.Y. 2023) (quoting *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018))

"When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge" *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). In evaluating "whether to issue a [PI], courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *McGregor v. Suffolk*

*County*, 690 F. Supp. 3d 147, 152 (E.D.N.Y. 2023) (*quoting Winter,* 555 U.S. at 24). "'A balance of equities tipping in favor of the party requesting a [PI]' means a balance of the hardships against the benefits." *Hunter v. Cortland Hous. Auth*., 714 F. Supp. 3d 46, 55 (N.D.N.Y. 2024)

**B.      Plaintiff has not Demonstrated an Irreparable Injury**

    To start, it is not sufficient for Plaintiff to argue that he will suffer an irreparable injury – any such injury must be imminent. ESI has been served with a Notice of Eviction. *See* Ecf. Dkt 12. Thus, eviction can happen no earlier than March 24, 2025. Even after that date, although the City will take possession of the Premises, the Premises will not be cleared for at least 30 days, during which time Plaintiff will have limited supervised access and can arrange for potential relocation of the various statues. Only after this thirty-day period has expired – on or after April 23, 2025 – will the City begin to take any initial steps to clear the site to allow for pre-construction environmental testing. Since plaintiff cannot show an imminent and irreparable injury, Plaintiff is not entitled to a TRO or PI.

**C.      Plaintiff Does not have a Likelihood of Success on the Merits of his VARA Claim**

    *1.  VARA*

    "In enacting VARA, Congress enshrined an artist's moral rights of attribution and integrity for the duration of the artist's lifetime. VARA establishes a scheme of protection calibrated to mediate between artists' rights to protect their artistic reputation and the integrity of their works and art owners' rights to control the works in their possession." *Kerson v. Vermont Law Sch., Inc.*, 79 F.4th 257, 260 (2d Cir 2023).

    Pursuant to 17 USC § 106A(a)(3), the author of a work of visual art "shall have the right— (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right" and "(B) to prevent any

destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right." "[T]he rights conferred by subsection (a) shall endure for a term consisting of the life of the author." *Id.* at (d).

   For the purposes of VARA, "a work is of recognized stature when it is one of high quality, status, or caliber that has been acknowledged as such by a relevant community." *Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166 (2d Cir. 2020). VARA applies only to works of visual art, "a narrow class of art defined to include paintings, drawings, prints, sculptures, or photographs produced for exhibition purposes, existing in a single copy or limited edition of 200 copies or fewer." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 83 (2d Cir. 1995) (*citing* 17 U.S.C. § 101). Where multiple works are considered to be a single work of art they are "to be analyzed under VARA as a whole," while separate works are "considered individually." *Carter*, 71 F.3d. at 83. Multiple works are considered to be a single work if they are "thematically consistent, interrelated work whose elements could not be separated without losing continuity and meaning." *Id.* at 84.

### 2. The Garden was Constructed in Violation of the Lease and is not Therefore Entitled to the Protections of VARA

   Pursuant to the Lease, the Premises was to "be used for no other purpose than storage of Sculptures and [] any as of right use…."[2] Further, Article 19 of the Lease stated that the tenant "must not change or add to the Premises without the prior written consent of LANDLORD…. TENANT must not attach any advertisement, notice, or sign to the outside of the Premises without first obtaining LANDLORD's prior written consent." Notwithstanding Article 19 of the Lease (Zilkha Dec. Exhibit "A"), Allan Reiver planted trees and installed, *inter alia*, statues and a gazebo

---

[2] Plaintiff does not use the Premises to store sculptures. Rather, he uses the Premises to display them as the Garden. While this may appear a small point, one could not reasonably argue a warehouse used to hold works of art qualifies as a work of art in its own right. However, Plaintiff contends the Premises, now converted into the Garden, is exactly that, in no small part because of the individual pieces of art displayed there. The conversion of the Premises from a yard used to *store* sculptures into the Garden, which *displays* them, is central to Plaintiff's argument that the Garden qualifies for protection under VARA. This is also a blatant violation of the terms of the Lease.

and attached signage to the outside of the Premises. Plaintiffs do not even allege that they sought the required landlord consent. Thus, since all of the "improvements" made to the Premises were done in violation of the Lease, the Garden is not entitled to the protection of VARA because "VARA does not apply to artwork that is illegally placed on the property of others, without their consent, when such artwork cannot be removed from the site in question." *English v. BFC&R E. 11th St. LLC*, 97 Civ. 7446 (HB), 1997 U.S. Dist. LEXIS 19137, at *14 (S.D.N.Y. Dec. 2, 1997). This is true even if the City did not affirmatively object to the placement of the artwork because "the City's failure to object cannot constitute estoppel. Any other conclusion would require the City to vigilantly patrol all vacant lots in the City to ensure that any activity proceeding therein was promptly stopped, lest the City give up its rights to the property." *Id*. at *13-14.

### 3. Plaintiff is not the Artist under VARA and therefore does not have Standing to Seek Declaratory Relief

VARA only protects the rights of the artist through the artist's lifetime. *See Pollara v. Seymour*, 344 F.3d 265, 265 (2d Cir 2003) ("VARA secures an author's lifetime right to protect against 'intentional distortion, mutilation, or other modification' of a 'work of visual art' and against 'any [intentional or grossly negligent] destruction of a work of [visual art having] recognized stature'…") "The authors of a joint work of visual art are co[-]owners of the rights conferred by subsection (a) in that work." 17 USC § 106A(b). Thus, in the event of a joint work, "the rights conferred by subsection (a) shall endure for a term consisting of the life of the last surviving author."

In the Complaint, Plaintiff claims to have jointly created the Garden. Complaint ¶ 57. This is a new claim, not previously raised by Plaintiff or ESI in any forum. In fact, in a trial in Civil Court of the City of New York, Plaintiff admitted, under oath, that it was his father, the deceased Allan Reiver, and not himself who created the Garden. *See* Zilkha Dec. Exhibit "I" at

30:17-19; 33:14-23. Plaintiff testified that he is the "manager of" the Garden. He "help[s] maintain the grounds, keep it clean, help to garden and help all of the different nature investments in the space." *Id* at 23:20-11. He also testified that he helps with programming. *Id*. at 22:23. Although he described the Garden as a "work of art in every right" he then admitted that the Garden was created by his father and that his role was simply in "managing it and preserving it and managing the programs there for the public." *Id*. at 22:23-24. When asked to describe the Garden, he testified that his father "built the Garden." *Id*. at 30:18-19. Of the larger sculptures on the Garden, he testified that "[t]here are ones of an [*sic*] historical nature as well that we do not have experience moving and we have not touched to move." *Id.* at 30:20-21. He also testified that the Garden was created by his "father to build a landscape garden that showcased these pieces as an outdoor extension of the gallery." *Id*. at 33:21-22.

Similarly, at a March 13, 2019 public hearing of the New York City Planning Commission, Plaintiff testified that his "father built the garden in 1991"[3] and that his role involved helping "the volunteer effort that started in 2013."

Plaintiff is not the artist of the lot for the purposes of VARA – to the contrary he is a caretaker of the Garden and his role as a caretaker of the Garden does not grant him moral rights as a "co-owner" under VARA and he cannot maintain this action.

### 4. *The Garden is Not a Work of Visual* Art

Plaintiff argues that the Garden should be considered a work of visual art under VARA as an "exemplary social sculpture" (Pls. Mem. at 3) and is an "integrated sculpture" through the "integration of the sculptural elements." *Id.* at 5. This argument fails. To start, to "qualify for moral-rights protection under VARA," a work "cannot just be 'pictorial' or 'sculptural' in some

---

[3] *See* March 13th, 2019: City Planning Commission Public Hearing at 2:08:52 (last visited March 11, 2025).

aspect or effect, it must actually *be* a 'painting' or a "sculpture.' Not metaphorically or by analogy, but *really*." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 300 (7th Cir 2011) (emphasis in original).

The Second Circuit has not yet opined as to whether a garden can be a work of visual art. However, where, as here, no sculptural element of the garden was created by Plaintiff, but where the Garden instead consists of an arrangement of plants and sculptures (created by others), there is no doubt that such a garden cannot be considered a work of visual art for the purposes of VARA. Plaintiff argues "just as the artists in [*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995)], the Reivers selected each additional element based on the elements preceding it so that they would mesh together into an integrated whole." *See* Pls. Mem. at 13. Plaintiff's reliance on *Carter* is misplaced.

In *Carter*, the Court found that a work of art in a building lobby consisting of various components of independent pieces of artwork constituted a single work of visual art. However, the artists in *Carter* not only arranged the components; they also created these components specifically to be incorporated into one installation. *Carter*, 71 F.3d at 80. The individual artworks were created by artists and separately were copyrightable. The arrangement of this originally authored artwork therefore also constituted a work of visual art. In contrast, here Plaintiff's father arranged a number of elements created by others at various times and for various purposes. Similarly, the plaintiffs in *English*, 1997 U.S. Dist. LEXIS 19137, at *1, not only arranged the artwork at issue, they also created the artwork at issue; for example, painting murals and installing sculptures they had created. Further, the *English* case did not answer the question of whether the collection of murals and sculptures at issue represented a single work, because the case was decided on other grounds. *Id.* at *14. Moreover, Plaintiff's reading of *Carter* as "confirming that a garden, such as the one that is the subject of this action is entitled to VARA

protection as a single integrated work of visual art" is erroneous. *See* Pls. Mem. at 14. Neither *Carter* nor *English* decided whether a garden could qualify as a work of visual art for the purposes of VARA. Even if they had, such decisions would be distinguishable from the present case for the reasons set forth above.

In essence, the Garden is at best a work of curation. Plants and sculptures were selected and placed in a manner designed to complement each other. While this may well require some skill, it does not create a work of visual art protected by VARA. Otherwise, galleries or museums would qualify for the same protections.

Plaintiff's argument distinguishing the instant matter from *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir 2006), is likewise unavailing. Plaintiff argues that the *Phillips* Court left open the question of whether a park could qualify as a visual work of art, instead ruling that, if a park could be a work of visual art, the park at issue in the litigation did not qualify as such. *See Phillips v. Pembroke Real Estate, Inc.*, 288 F. Supp. 2d 89 (D. Mass. 2003). Plaintiff argues that, unlike the *Phillips* plaintiff, he and his father "created the Garden from a bare, derelict, vacant lot. They did not simply create sculptures for existing space. Rather, they designed the Garden layout, carefully curated the sculptural elements to be installed and accentuated the inorganic elements with organic plantings." Pls. Mem. at 15. Therefore, Plaintiff insists, *Phillips* indicates the Garden is a work of visual art protected by VARA.[4] There are two glaring problems with this position. First, although Plaintiff claims "[t]he entirety of the Garden was created by the Reivers," this is not strictly speaking true. The Reivers, unlike the *Phillips* plaintiff, did not create a single piece of the "inorganic" sculptural or structural elements in the Garden. *See* Complaint, ¶¶ 30-33. Second, Plaintiff bases this argument on the claim that the First Circuit did not rule on

---

[4] It is worth noting that only Philips, the artist, sought to enforce his rights under VARA. The landscape architect did not.

the "critical issue" of whether a park might qualify as a work of visual art for the purposes of VARA. *See* Pls. Mem. at 14. As discussed in more detail, *infra*, this is not an accurate reading of the case, as the First Circuit definitively ruled a park could not qualify for VARA protection. *See Phillips*, 459 F.3d at 143.

This case is most similar to *Kelley v. Chicago Park Dist.*, 635 F.3d 290 (7th Cir 2011). In *Kelley*, as here, the elements of the garden sought to be protected were not created by the plaintiff but were arranged by plaintiff. The plaintiff in *Kelley*, like plaintiff's father, installed flower beds "set within gravel and steel borders," installed a gravel walkway, and planted wildflowers. *Id.* at 293. He selected species of wildflowers for, *inter alia*, "various aesthetic, environmental, and cultural reasons." *Id.* After planting the seeds, the plaintiff and "his volunteers tended the impressive garden. They pruned and weeded and regularly planted new seeds, both to experiment with the garden's composition and to fill in where initial specimen had not flourished." *Id*. at 294. Subsequently, the Park District decided to reconfigure this garden. "The elliptical borders became rectilinear, weeds were removed, surviving wildflowers were replanted in the smaller-scale garden, and some new planting material was added." *Id*. at 295. The Court rejected plaintiff's VARA claim, concluding that:

> Gardens are planted and cultivated, not authored. A garden's constituent elements are alive and inherently changeable, not fixed. Most of what we see and experience in a garden— the colors, shapes, textures, and scents of the plants—originates in nature, not in the mind of the gardener. At any given moment in time, a garden owes most of its form and appearance to natural forces, though the gardener who plants and tends it obviously assists. All this is true of [the subject garden] Wildflower Works, even though it was designed and planted by an artist.

*Id.* at 304 (7th Cir 2011); *see also* Kilmer, Joyce, *Trees* (1913).

VARA works in conjunction with the Copyright Act of 1976, "supplement[ing] general copyright protection. To qualify under VARA, a work must first satisfy basic copyright standards. Under the Copyright Act…copyright subsists in 'original works of authorship fixed in

any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated.'" *Kelley*, 635 F3d at 299 (*quoting* 17 USC § 102(a)).

Plaintiff's Declaration all but concedes the Garden is not "fixed" for the purposes of VARA. Plaintiff argues that "[t]he fixed inorganic elements of the Garden are complemented by plantings that have specifically been curated to accentuate the sculptural elements. For example, creeping ivy has been specifically planted to grow along the base of both the resting lions so that when the ivy grows out it is trained to grow along the lions mane and create a living Ivy mane for the summer season. The selection of plantings takes into consideration seasonal changes incorporating that into the work of art." *See* Declaration of Joseph Reiver ¶ 9.

Plaintiff explicitly alleges that the "inorganic" portions of the garden are fixed, in contrast to the plants that make up the Garden. This variability was specifically sought after by Plaintiff, just as in *Kelley*. Plaintiff further alleges the Garden is a "dynamic, living entity" with an "evolving nature." *Id.* at ¶ 13; *see also* Declaration of Mara Miller ("Miller Dec."), p. 6 ("Though the design of the garden itself is unique, creative, and substantially fixed, the experience of it from moment to moment is constantly changing since natural light, the seasons, plant growth and the presence of insects, birdsong and people vary and contribute to its artistic expression."). The *Kelley* court applied nearly identical reasoning in determining that a garden is *not* copyrightable, and therefore not protected by VARA.

> [W]hen a landscape designer conceives of a plan for a garden and puts it in writing—records it in text, diagrams, or drawings on paper or on a digital-storage device—we can say that his intangible intellectual property has been embodied in a fixed and tangible 'copy.' This writing is a sufficiently permanent and stable copy of the designer's intellectual expression and is vulnerable to infringing copying, giving rise to the designer's right to claim copyright. The same cannot be said of a garden, which is not a fixed copy of the gardener's intellectual property. Although the planting material is tangible and can be perceived for more than a transitory duration, it is not stable or permanent enough to be

called 'fixed.' Seeds and plants in a garden are naturally in a state of perpetual change; they germinate, grow, bloom, become dormant, and eventually die. This life cycle moves gradually, over days, weeks, and season to season, but the real barrier to copyright here is not temporal but essential. The essence of a garden is its vitality, not its fixedness. It may endure from season to season, but its nature is one of dynamic change.

*Kelley*, 635 F.3d at 305.

To the extent a garden may be considered a work of art, the Garden is *still* nevertheless not a work of visual art for the purposes of VARA because it is at most a work of applied art and applied art is not covered by VARA. Applied art for the purposes of VARA consists of "utilitarian works." For example, "VARA may protect a sculpture that looks like a piece of furniture, but it does not protect a piece of utilitarian furniture, whether or not it could arguably be called a sculpture." *Pollara v. Seymour*, 344 F.3d 265, 269 (2d Cir. 2003). In *Cheffins v. Stewart*, 825 F.3d 588 (9th Cir. 2016), the Court of Appeals for the Ninth Circuit affirmed the trial court's grant of summary judgment finding that a school bus that had been transformed into a 16th century Spanish galleon was applied art because "it began as a rudimentary utilitarian object, and despite being visually transformed through elaborate artistry, it continued to serve a significant utilitarian function upon its completion." *Cheffins*, 825 F.3d at 595. The converted school bus's continuing utility made it a piece of applied art and thus it was not protected under VARA. *Id.*

Here, as is made clear by the Reiver and Millers Dec., the Garden is best understood as a privately-operated community space for education and the performance and display of art. *See* Reiver Dec. ¶¶ 12-14; Miller Dec. p. 12. Much of the Reiver and Miller Decs., as well as the Declaration of Klaus Biesenbach, are concerned with laying the groundwork for the Garden to be considered a work of "social sculpture" due to its many uses as a performance and educational space. This may well be, however, VARA does not protect "social sculpture." VARA protects

14

*actual* sculpture. *Kelley*, 635 F.3d at 300. As the court in *Kelley* said, "the law must have some limits; not all conceptual art may be copyrighted." *Id.* at 304.

**5. Assuming, *Arguendo*, the Garden is a Work of Visual Art, VARA does not Protect Site Specific Artwork from Relocation**

Plaintiff also seeks to maintain the configuration of the Garden in the Premises. Plaintiff is not entitled VARA protection for the placement of statutes and plants at the Premises; while artworks covered by VARA are protected against "intentional distortion, mutilation, or other modification of" those works, VARA does not protect against the relocation of works, whether or not they are site-specific. Specifically, VARA contains an exception that explicitly states that the "modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and ***placement***, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence." 17 U.S.C. § 116A(c)(2) (emphasis added). In other words, VARA does not require that even a site-specific work of art be kept in the same location. The purpose of the statute "is not . . . to preserve a work of visual art *where* it is, but rather to preserve the work *as* it is." *Bd. of Managers of Soho Int'l Arts Condo. v. City of New York,* 2003 U.S. Dist. LEXIS 10221, *34 (S.D.N.Y. 2003 June 17, 2003) (emphasis in original).

As noted, *supra*, Plaintiff misreads the First Circuit's holding in *Phillips*. The First Circuit did, in fact, decide whether a park (arguably the example *ne plus ultra* of a site-specific endeavor) might qualify for protection under VARA, and decided definitively that it did not. *Phillips*, 459 F.3d at 143 ("VARA does not apply to site-specific art at all.").

To be clear, the City's position is that the Garden is *not* a site-specific work of art. To the extent the Garden is a work of art at all, it would be just as much a work of art were it

removed and reassembled elsewhere.[5] However, in order to prevent ESI's eviction from the premises, Plaintiff now claims the Garden is a site-specific work of art, which would be destroyed if it were moved. This argument is of no use to Plaintiff. As the First Circuit reasoned in *Phillips*, site-specific art is a form of integrated art, which is to say the value of the art is inherent in both the form of the art itself, and its location of display. *Id.* at 140. VARA permits the removal and replacement of works of art under the so-called "public presentation exception." *Id.* at 140; 17 USC § 106A(c)(2). However, this creates an untenable tension. If site-specific art is protected from intentional distortion, mutilation, or other modification by VARA, and altering the placement of site-specific art would distort, mutilate or otherwise modify the site-specific art, then VARA must prevent the removal or replacement of site-specific art. That argument is expressly rejected by 17 USC § 106A(c)(2), which explicitly permits the removal and replacement of art covered by VARA. Therefore, either VARA does not protect site-specific art, or there is an unwritten "site-specific art exception" to the "public presentation exception." Needless to say, no such exception to the exception exists in the statute. The First Circuit declined to invent one. *Phillips*, 459 F.3d at 142.

In *Tobin v. Rector*, 17 Civ. 2622 (LGS), 2017 WL 5466705 (S.D.N.Y. 2017 November 14, 2017) *aff'd on other grounds, Tobin v. Rector, Church-Wardens, & Vestrymen of Trinity Church*, 735 Fed. Appx. 32 (2d Cir. 2018), this Court determined that the relocation of a piece of site-specific artwork, related to September 11, 2001, did not violate VARA when it was relocated from Lower Manhattan to Connecticut because relocating the work at issue did not "by itself constitute distortion, mutilation or modification under VARA. Even assuming that [the work

---

[5] Much of the declarations appended to the Order to Show cause speak to the great value to the community the Garden represents. This is of no relevance to whether the Garden qualifies as a work of visual art under VARA, which it does not. Communities and cities are made up of many institutions which are of great benefit to the people living in them, without also being works of visual art which are immune from eviction.

is] site-specific art, and that changing its location results in its 'modification,' that modification 'is the result of . . . the public presentation, including . . . placement, of the work' and therefore is not actionable unless the modification is caused by gross negligence." *Tobin v. Rector*, 17 Civ. 2622 (LGS), 2017 WL 5466705, at *5 (S.D.N.Y. 2017 November 14, 2017).

Although the *Tobin* Court cited the First Circuit's decision in *Phillips*, it adopted the same reasoning as the *Phillips* District Court, holding that even if the work was site-specific, moving the work was permitted by the public presentation exception. The Second Circuit upheld the result, but reasoned instead that the plaintiff had waived any right to having the work displayed in the same location when he agreed that the work could be loaned out to third parties, which would necessitate moving it. *See Tobin* , 735 Fed. Appx. at 33-34.

In any event, the result for the instant case is the same. Either site-specific works of art are not protected by VARA, as the First Circuit held in *Phillips*, or site-specific works are covered but the public presentation exception that nevertheless permits their removal and replacement, as held by the District Courts in *Phillips* and *Tobin*. Under either interpretation of VARA, the Court should not grant the requested TRO or PI, as VARA does not prohibit removal of the Garden.

Plaintiff's conception of VARA creates a legal framework which requires, upon the creation of a work of site-specific visual art of recognized stature, that the work be preserved, immovable and immutable, regardless of any other laws or rights associated with where the work is located. Plainly, this is not what the drafters of VARA intended. As discussed, *supra*, the statute includes an explicit provision permitting the movement of a work of art to a different placement from where it was originally displayed. *See* 17 USC § 106A(c)(2). Indeed, a provision was even

made for the removal or alteration of artwork incorporated into buildings (*see* 17 USC § 113(d)(1)) and for destruction caused by the passage of time. *See* 17 USC § 106A(c)(1).

### 6.  *The Garden is not a Work of Recognized Stature*

For the purpose of VARA, whether a work is of recognized stature requires analyzing two prongs: first, whether the "visual art in question has 'stature,' i.e. is viewed as meritorious," and "that this stature is 'recognized' by art experts, other members of the artistic community, or by some cross-section of society." *Cohen v. G&M Realty L.P.*, 988 F. Supp. 2d 212, 217 (E.D.N.Y. 2013). "The phrase 'recognized stature' is not defined in VARA. In light of the preservative goal of this section, however, the recognized stature requirement is best viewed as a gate-keeping mechanism--protection is afforded only to those works of art that art experts, the art community, or society in general views as possessing stature." *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 324-5 (S.D.N.Y. 1994).

For example, in *Martin v. City of Indianapolis*, 982 F. Supp. 625 (S.D. Ind. 1997), the Court considered "newspaper and magazine articles" evidencing that the work at issue was socially valuable and [had] artistic merit" in finding that a work was of recognized stature.

Plaintiff argues that the Garden "qualifies" as a work of recognized stature and it has "achieved local and nationwide recognition since its completion by experts and nonexperts alike and has been the subject of numerous articles in the press and in on-line publications." Mem. pp. 17-18. Plaintiff also describes the Garden as an example of outsider art. Mem. p. 19. Yet, none of the articles annexed to the Complaint, and none of the Declarations specifically describe the Garden as a work of recognized artistic stature. That the Garden is beloved, maybe aesthetically pleasing, and is appreciated as an open space in an otherwise congested area, does not mean that the Garden, as a collective work of art, has attained recognized stature. None of the articles annexed to the complaint, for example, describe the artistic merit of the Garden, instead focusing

on its aesthetic properties. Popularity does not, itself, indicate recognized stature of the Garden as a work of visual art.

The Declarations annexed to the order to show cause do attempt to address this omission. However, they are insufficient to demonstrate that the Garden is a work of recognized stature *as a work of visual art*. Instead, they generally argue that the Garden is a "social sculpture" Dr. Mills argues that the Garden is "multi-sensual" like other "complex artkinds, such as dance or architecture." *Id.* at 11. Notably neither of these similar "complex artkinds" are works of visual art, per the statutory definition. *See* 17 USC § 101.

The Declaration of Klaus Biesenbach does briefly discuss Mr. Biesenbach's personal appreciation for the Garden as a "sculptural installation", and references (without including any examples) letters and endorsements from "the public, media, and prominent figures." *See* Declaration of Klaus Biesenbach ¶ 2.4. However, there is little discussion of any widespread recognition of the Garden as a work of visual art. Instead, much of the Declaration concerns its stature as a "social sculpture," which is not protected by VARA. *Id.* at ¶¶ 3.1-3.7. Similarly, the Declaration of JR does include the assertion that the Garden is "a cohesive work of visual art" but the basis of its "global recognition" is as a "transformative artistic and community space." *See* Dec. of JR, ¶¶ 8.1, 7.1-7.3. The Declaration of Jeffrey L. Brodie contains no allegations about the recognized stature of the Garden. Instead, the Declaration describes the Garden as "a living, breathing work of art that visitors can walk through and sit among", a "living canvas" and as a "vibrant hub of creativity and community engagement." *See* Brodie Dec.., p. 2. Crucially, Mr. Brodie's declaration refers to the Garden as an "environment." *Id.* at p. 3. This sentiment is reiterated in the Declaration of Noah Chasin, which describes the Garden as "social art." *See*

Declaration of Noah Chasin, p. 4. The Declaration of Patti Smith also focuses on this aspect of the Garden's appeal. *See* Smith Dec., ¶¶ 8-11, 14, 15, 18.

The common theme of these declarations is to emphasize the value of the Garden as a community space, as a performing arts space, and as a place for quiet contemplation. The merit of the Garden as any of these things is not in dispute. However, for the Garden to have achieved recognized stature for the purposes of VARA, it must have achieved recognized stature *as a work of visual art as defined by VARA*—i.e., as a "painting, drawing, print, or sculpture." *Pollara*, 344 F.3d at 270, fn. 5 ("VARA only protects works of recognized stature that are "work[s] of visual art".". The declarations fail to demonstrate this.

### 7. *Building Affordable Housing on the Site will not be Prejudicial to Plaintiff's Honor or Reputation*

Plaintiff argues that the City's "stated intention to raze the [Garden] and move forward with construction of the Project clearly will destroy, distort, mutilate, and/or otherwise will modify the [Garden]" and that this will "denigrate the value of the work itself, it also will undoubtably tarnish Plaintiff's reputation as an artist committed to social participation in art. As a result, Defendant's stated plans, if permitted to proceed, would be extremely prejudicial to Plaintiff's reputation and honor."

To start, that the City will discontinue the lease, requiring relocation of the Garden, will not constitute a violation of VARA as VARA does not prevent the relocation of works of art. Further, any modifications to the lot will not prejudice Plaintiff's reputation and honor and thus this argument fails as a matter of law. In *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994), the Court noted that "in determining whether 'intentional distortion, mutilation, or modification' of the Work would be 'prejudicial to [plaintiffs'] honor or reputation,' this Court will consider whether such alteration would cause injury or damage to plaintiffs' good name,

public esteem, or reputation in the artistic community." *Carter*, 861 F. Supp. at 323. Thus, although the site may be cleared, there is no allegation that this will happen in a way that might cause damage to the Plaintiff's good name. The instant action can be distinguished from *Pavia v. 1120 Ave. of the Ams. Assoc.*, 901 F. Supp. 620 (S.D.N.Y. 1995), where this Court found that the plaintiff had adequately asserted that his honor and reputation as an artist would be damaged where the work at issue had been "displayed improperly by distorting, altering, defacing, modifying and mutilating it, thus harming his honor and reputation as an artist." *Pavia*, 901 F. Supp. at 627. Similarly, in *Massachusetts Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010), the Court found a violation of an artist's moral rights where the Massachusetts Museum of Contemporary Art Foundation ("MASS MoCa") "continu[ed] to work on the installation without his authorization, particularly in early 2007, and by then exhibiting the distorted artwork to the public; second, by using tarpaulins to "partially cover[]" -- and thus modify and distort -- the installation, and allowing Museum visitors to see it in that condition; and third, merely by showing Buchel's work in its unfinished state, which he claims was a distortion." *Id*. at 56. In reversing a grant of summary judgment, the Court held that a question of fact existed as to whether these actions may harm the plaintiff's reputation or "effected an intentional distortion or other modification of "Training Ground" that subjected MASS MoCA to liability under VARA." *Id*. at 50-60.

D.    **The Balance of the Equities Favors Denying the TRO and PI and the Public Interest Would not be Served by Granting the TRO or Permanent Injunction**

"In determining whether the balance of the equities tips in the Plaintiff's favor and whether granting the [PI] would be in the public interest, the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Marlinspike Hall LLC v. Bar Lab Concepts LLC*, No. 23 Civ. 2997 (JPO), 2023

US Dist LEXIS 185774, at *29-30 (SDNY Oct. 17, 2023). "[W]hen a court orders injunctive relief, it should ensure that [an] injunction does not cause harm to the public interest." *Hercules Pharms., Inc. v. Cherne*, No. 24 Civ. 5659 (JS)(AYS), 2024 US Dist LEXIS 183232, at *14 (E.D.N.Y. Sep. 18, 2024) (*quoting U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012)). When, as here, the government is a party to the suit, the inquiries into the public interest and the balance of the equities merge. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

Plaintiff does not actually address the balance of equities. Rather, the section of Plaintiff's memorandum of law purporting to lay out the equities merely restates, in conclusory fashion, Plaintiff's contention that the harm to the Garden would be irreparable. However, Plaintiff fails to acknowledge that the City seeks to recover the property solely to develop it into affordable housing for low-income seniors, in a highly desirable, transit accessible and service-rich neighborhood where affordable housing is especially scarce.

Denying the City this right by granting Plaintiff the requested injunctive relief would harm the public interest and, therefore, Plaintiff's motion should be denied. The balance of the equities favors allowing the City to proceed without further delay in using its property to address the acute housing crisis, while still providing new open space and community resources. Any injury from discontinuing the Plaintiff's use of the site as open space would be mitigated by the new permanent open space that will be provided as part of the housing project.

In New York City, seniors aged 65 and over have a poverty rate of 20%--double the national average. An estimated 300,000 seniors are on the waiting list for federally-funded affordable senior housing in New York City and the average wait time for a unit is seven years. Furthermore, the number of homeless individuals aged 65+ has increased an average of 10% each

year since 2014. Sand. Dec. ¶ 21. Since 2014, the City has financed the creation of only 300 affordable units in Manhattan Community District 2, where the Premises is located. *Id.* at 19.

Haven Green marked the culmination of a process in which policymakers wrestled extensively with balancing the well-liked garden and the desperate need for affordable senior housing. The project was adopted as an important step in addressing both needs: it will contain 123 affordable units, including for deeply low-income and formerly homeless seniors; it will also include new open space, funded by the developer and open from dawn to dusk. *Id*. at 35.

Litigations have unsuccessfully delayed the construction of Haven Green although all New York state courts, have repeatedly rejected these attempts. Any value from "free activities" in the Garden is outweighed by the needs of low income seniors brought to the brink of homelessness. Under the now-terminated Lease, ESI paid just $4,000 a month for a 20,110 square foot plot of land in a neighborhood where the average rent for a one-bedroom apartment is more than $4,600 a month.[6] this large City-owned lot was rented for less than the average rent for a single small apartment. Living in an accessible and vibrant area like NoLIta should not be limited to those who can pay upwards of $5,000 a month.

Furthermore, though the Plaintiff styles his challenge as a VARA claim, the actual arguments rely heavily on the Garden's value as open space and a "social sculpture." However, the proposed housing development will also feature open space that, while somewhat smaller, will be permanently open for more hours than the Garden, will be designed with public participation from the outset, and will not depend for its continued existence on the availability of the Plaintiff's volunteers. Sand. Dec. at ¶¶ 35, 36. On that basis, the City determined in 2019 that proceeding with the proposed development will have no significant impact on the open space resources in the

---

[6] See https://www.zumper.com/rent-research/new-york-ny/nolita (last visited March 12, 2025).

community—a determination that has been specifically upheld by New York's highest court against ESI's prior legal challenge. Zilkha Decl., Exhibit "G."

Since 2019, the City has negotiated with neighbors to further expand the Haven Green open space by combining it with the formerly private courtyard of the neighboring housing development, bringing the total public open space associated with the Haven Green project to approximately 14,040 square feet (Sand. Dec. at ¶ 35) which can maintain the Garden's "musical performances, poetry readings, movies screenings, wellness classes, tea ceremonies." Pls. Mem. at 21. Thus, the true injury they seek to prevent is not the loss of the open space itself, but the loss of their exclusive authority over how to program and use that space. This injury cannot overcome the City's need to house its destitute seniors.

Nor is the balance of the equities altered by the Plaintiff's claim that it has proposed "alternative" sites for affordable housing. As the City has repeatedly explained, Haven Green alone is not a solution to the City's affordable housing crisis. It merely helps contribute to alleviating the housing shortage. Thus, proposing an "alternative" site makes little sense because the City is attempting to advance many affordable housing projects. The fact that the City is now developing housing at the nearby 388 Hudson Street—another City-owned site previously suggested as an "alternative"—does not make Haven Green unnecessary. Furthermore, many of the Plaintiff's proposed "alternatives" are fatally flawed, and serve only to distract from the necessity of proceeding with Haven Green. Sand. Dec. ¶¶ 44-50.

Finally, Plaintiff argues that, at most, the effect on the City of enjoining Haven Green will be a "brief delay in implementing its Project plans." Pl. Mem. at 21. However, the delays attributable to the Plaintiff's serial lawsuits are already measured in years. This new claim—that the Garden is a stand-alone work of sculpture entitling ESI to remain on the City's property

in perpetuity—could have been litigated in concert with Plaintiff's challenge to Haven Green's environmental review. In determining the balance of the equities, this Court should not blind itself to the fact that under the circumstances of this case, the delay does not appear to be a side effect of the litigation—it is its aim. As a judge of this Court held in *Bryan v. Koch* 492 F. Supp. 212 (S.D.N.Y. 1980), *"the strong public interest in effective . . . local government is an important factor to be weighed in the equitable balance. At least some reasonable chance of success on the merits and evidence of greater possible harm should be required before a federal court adds to the difficulty and cost of our local and state governments by enjoining long-considered decisions pending final, often long-delayed, judicial determinations."* *Id*. at 238. An injunction in this matter would represent yet another encroachment on the authority of New Yorkers' elected representatives.

Though the Plaintiff and his declarants are undoubtedly sincere in their affection for the Garden, they had a full opportunity to make their case of preserving it—and did so (notably without ever arguing that the Garden was a work of visual art)—during the public process that led to the City's 2019 determination to build Haven Green. The Lease does not grant a permanent veto over changes to the Premises. Rather than preserve the garden, the City is compromising by developing both housing and open space. The public has a strong interest in having that determination implemented without further delay.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's request for a TRO and PI.

Dated: New York, New York
      March 12, 2025

                    MURIEL GOODE-TRUFANT
                    Corporation Counsel of the City of New York
                    *Attorney for Defendants*
                    100 Church Street, Room 5-169
                    New York, New York 10007
                    (212) 356-2183
                    gzilkha@law.nyc.gov

By: _____

                    Genan F. Zilkha
                    Gregory B. O'Brien
                    Nathan Taylor
                    *Assistant Corporation Counsels*